## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Case No. 25-cr-151** |
| | ) **Hon. Rossie D. Alston, Jr.** |
| **NICHOLAS HANLON,** | ) **Sentencing Date: March 11, 2026** |
| *Defendant.* | ) |

---

## MEMORANDUM IN AID OF SENTENCING

Nicholas Hanlon appears before the Court facing an extraordinarily severe penalty. Because of his prior conviction, the law requires a lengthy mandatory minimum sentence, and the government seeks the ultimate sanction of life imprisonment. Mr. Hanlon does not minimize the seriousness of his conduct. He has accepted responsibility for his offenses and recognizes the profound harm they have caused. Nor does he ignore the fact that he has been convicted of a similar offense before. That history is real and troubling. But it is also true that the underlying conditions that shaped Mr. Hanlon's conduct, ███████████████████ ███████████, were never meaningfully addressed despite periods of treatment. Furthermore, when he was released from custody, it was at the onset of the COVID pandemic, when access to treatment and support services was sharply limited and the social isolation of that period made it easier to retreat into the online spaces that fueled his offending.

The Court's task under 18 U.S.C. § 3553(a) requires consideration not only of the offense, but also of the person standing before the Court. Mr. Hanlon's life history

reflects longstanding struggles that went largely untreated and unmanaged for years. Yet those who know him best describe a person capable of empathy, compassion, and reflection - someone who has expressed genuine remorse and a sincere desire to change. The Court must impose a substantial sentence, but the question before it is whether a life sentence, as opposed to the already severe mandatory minimum, is greater than necessary to satisfy the purposes of sentencing.

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines (the "Guidelines"), Mr. Hanlon states that he has received and reviewed the Presentence Report ("PSR") prepared in this case. Mr. Hanlon recognizes that a substantial sentence is mandated by law, and he submits that the 45-year term of confinement that is required is sufficient, but not greater than necessary, to accomplish the goals of sentencing in light of his background, the nature and circumstances of the offense, his prior criminal history, and the goals of sentencing.

## BACKGROUND

On October 20, 2025, Mr. Hanlon pleaded guilty to an eleven-count indictment, charging him with various child exploitation offenses, without the benefit of a written plea agreement. By entering this plea, Mr. Hanlon accepted responsibility and spared the victims the burden of testifying at trial which was set to begin that day.  Further, at the change of plea hearing, Mr. Hanlon also agreed that the victims present could deliver their allocutions at that time, thereby relieving them of the need to return to court for sentencing.

With respect to the sentences available to the Court, Counts One, Three, Five, Six, and Eight, charging production of child pornography after prior conviction, each carry a mandatory minimum term of 35 years' imprisonment. Counts Two, Four, and Seven, charging coercion and enticement of a minor, each carry a mandatory minimum term of 10 years' imprisonment. Count Nine, charging receipt of child pornography after prior conviction, carries a mandatory minimum term of imprisonment of 15 years.  Count Ten, charging possession of child pornography after prior conviction, also mandates a sentence of ten years.   Count Eleven, which penalizes offenses committed by registered sex offenders, carries a mandatory minimum term of 10 years' imprisonment, which must be imposed consecutively to all other counts. Sentencing is currently scheduled for March 11.

## ARGUMENT

I. **A Sentence Is Meant To Be "Sufficient, But Not Greater Than Necessary" To Promote The Goals Of Sentencing, Notwithstanding the Applicable Guideline Range.**

After *United States v. Booker*, the Sentencing Guidelines range is advisory, and courts must consider it as just one of more than a half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).[1]  *See* 543 U.S. 220, 259-60 (2005); *see also*

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

*Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same). The primary directive in the actual language of § 3553(a) is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing. (Emphasis added).

The Court must keep in mind that, as the Department of Justice recently noted, determining the guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See Gov't Supp. & Amend. Sent. Mem.*, *United States v. Stone*, Case No. 19-cr-18-ABJ, Dkt. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors). Imposing a sentence that is sufficient, but not greater than necessary, is not just another factor for the Court to consider along with the others set forth in § 3553(a). Rather, it sets an independent limit upon the sentence.

## II.    Mr. Hanlon's Personal History and the Nature of the Offense Warrant a Sentence of no More than 45 Years

Mr. Hanlon's history and characteristics help explain, though not excuse, how he arrived before the Court. His upbringing was marked by instability, ███████████, ██████████████████████████████████████████████, which fostered deep feelings of isolation and inadequacy that played a role in his prior conviction and conduct before this Court. Yet Mr. Hanlon's earlier period of

incarceration also demonstrated that he can function productively within a structured environment: he engaged in available programming and responded well to the routine and stability of custody. His release, however, occurred during the extraordinary disruption of the COVID pandemic, when treatment resources, supervision, and normal supports were sharply curtailed, undermining the stability that had previously helped him succeed. The circumstances surrounding his past release were unusual and destabilizing. With improved treatment, greater insight into his own struggles, and the continued support of his family, along with the significant period of custody he now faces, the circumstances going forward need not mirror those of the past.

Mr. Hanlon's childhood was, for a time, structured and stable. Mr. Hanlon was born into a military household. His father served as a Marine, and as is common for military families, they moved frequently during his early years. (PSR ¶107). Despite the transience, Mr. Hanlon describes positive memories of living in military housing with his parents and sister. He was able to make friends even as the family relocated from base to base. Mr. Hanlon's father was actively involved in his upbringing. According to his mother, he coached Mr. Hanlon in sports and participated in his Boy Scout troop. (Exhibit A, Letter from Jeanne Hanlon; PSR ¶120). His involvement provided structure and consistency in Mr. Hanlon's early childhood.

That foundation fractured suddenly when Mr. Hanlon's father left the family. Mr. Hanlon recalls significant unrest in the home before the separation, including frequent arguments between his parents. (PSR ¶ 108). His mother recalls the

separation differently and maintains that it came as a surprise because there was little turmoil in the home before Mr. Hanlon's father left.   (PSR ¶ 120). What is not disputed, however, is that the separation itself was abrupt and deeply destabilizing.

Mr. Hanlon's father left the family without warning.  His mother confirms that, for a period of time, she did not know where her husband had gone and had to search to locate him.  She ultimately learned that he had run away with a woman he met on the internet. (PSR ¶ 120). Her attempts at securing child support payments were essentially fruitless, and the financial consequences were immediate and severe. (PSR ¶ 108).  The economic fallout forced the family into significantly more precarious living conditions. With limited income, Mr. Hanlon's mother struggled to maintain stability. (PSR ¶ 108). The family's living situation deteriorated, and resources became scarce.

Although Mr. Hanlon spent approximately one month with his father in New York after the separation, contact thereafter was limited. The once-involved parent who had coached his sports teams and attended Scout meetings was no longer consistently present, and Mr. Hanlon felt deserted. (PSR ¶ 108).  Mr. Hanlon withdrew socially and stopped participating in sports and other social extracurricular activities that he previously enjoyed and provided structure.  He was also required to change schools after his father left. In his new school environment, he struggled to form friendships and was bullied. To be sure, all of these stressors during his childhood, the loss of his father's involvement, financial instability, and social isolation, had a profound psychological impact. █████████████████████████████

███████████████████.

In addition to abandonment and financial hardship, Mr. Hanlon was exposed to sexualized material and boundary issues at a young age, prior to his father's departure from the home. His mother has expressed concern that his father may have been overly sexual in discussions with the children. (PSR ¶ 111). Mr. Hanlon recalls finding a pornographic magazine among his father's belongings, and pornography portraying his father was discovered in the childhood home. (PSR ¶ 140). It has also been reported that his father and stepmother maintained a "swinger" lifestyle. (PSR ¶ 111). This exposure at such a young age, whether fully understood or not, also likely contributed to the confusion, █████████████ Mr. Hanlon experienced during his childhood.

In some ways, Mr. Hanlon's teenage years brought much of the same. Mr. Hanlon entered high school shortly after his family relocated to Virginia. (PSR ¶ 112). The family environment during these years was unstable. At one point, the family moved in with Mr. Hanlon's aunt. That arrangement deteriorated amid household conflict and chaos, and the family was asked to leave. (PSR ¶ 112). Mr. Hanlon reports that his cousin, resentful of no longer being an only child, directed hostility and █████ ████████ toward him. Although the families later reconciled and resumed living together, the household remained volatile due to domestic violence by an uncle and verbal abuse within the home. This environment exacerbated Mr. Hanlon's fragile mental state. ██████████████████████.
████████████████████████████

███████████████████████████████████

Academically, Mr. Hanlon performed poorly consistently. (PSR ¶¶ 113, 121). He repeated the tenth grade at his mother's request because she believed he was developmentally more aligned with a younger cohort, and he ultimately graduated only with difficulty. His grades suffered throughout high school despite supports that were put in place, █████████████████████████████

██████

At the same time, he fared slightly better socially than he had in North Carolina, where he had been bullied. His participation in the high school band led to a sense of belonging. His mother recalls that Mr. Hanlon became deeply committed to the band, earning respect as a reliable and encouraging leader. (Exhibit A, Letter from Jeanne Hanlon; PSR ¶ 121). Despite his relative success in the band, there remained lingering awkwardness and insecurity.

Similarly, Mr. Hanlon's early adult years were marked by instability, social disconnection, and emotional setbacks that shaped the trajectory of his later conduct. After high school, Mr. Hanlon attempted to attend community college but was unsuccessful and eventually relocated to Morgantown to live with friends and work. That arrangement deteriorated, and following a falling out, he experienced a period of homelessness before returning to his family home in Virginia. (PSR ¶¶ 113, 121). During this period, he had also been engaged to a woman he met online; the relationship ended abruptly around 2008 when she falsely claimed to have aborted their child. Not surprisingly, this revelation was deeply emotionally devastating to

him. (PSR ¶ 119).  Upon returning home, he became increasingly isolated and lonely. It was during this time of social withdrawal and emotional distress that he began seeking connection through the internet, a pattern that ultimately contributed to the prior offense conduct.

In 2013, Mr. Hanlon was convicted of travel with intent to engage in illicit sexual conduct (one count) and receipt of child pornography (two counts).  He was sentenced to 96 months of imprisonment on each count, to be served concurrently. (PSR ¶ 97). ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ That period marked the beginning of his recognition that he needed help beyond punishment alone.

While incarcerated, Mr. Hanlon participated in individual therapy ████████ ████████████████████████████████████████████████ Although that treatment was inconsistent, it nonetheless reflected an early effort to engage with rehabilitative services. Importantly, Mr. Hanlon performed well during his period of incarceration. He responded positively to the structure of confinement and maintained steady employment within the Bureau of Prisons, demonstrating reliability, compliance, and an ability to function productively in a highly regulated environment.

Upon completion of his sentence, Mr. Hanlon began his term supervised release in February 2020, just before the onset of the COVID-19 pandemic.  The transition back into the community under extraordinary circumstances that significantly

limited access to treatment, employment, and social support bears directly on the conduct now before the Court.

Indeed, following his release in 2020, Mr. Hanlon returned to the community at a time when in-person connections were severely curtailed by the pandemic. Training programs were closed, employment opportunities were limited, and community-based mental health treatment shifted largely to virtual or telephone formats. Although Mr. Hanlon ultimately obtained employment, a subsequent back injury forced him to stop working, further exacerbating his isolation ███████████. (PSR ¶ 159). Consequently, he became increasingly sedentary, gained weight, and withdrew into video games and online activity.

During this time, Mr. Hanlon developed a number of online relationships - some of which were with same-age peers, some of which were not. Many of Mr. Hanlon's online chats, including those with the underaged victims involved in the instant offense, included sexual content – conversations, images, and videos. He engaged in this behavior despite his prior conviction, despite being a registered sex offender, and despite being on supervised release.

Mr. Hanlon does not minimize or attempt to justify the instant offense. Despite ongoing mental health struggles, he has acknowledged that his behavior was wrong and harmful. As reflected in letters submitted by his mother, stepfather, and a close friend, he has demonstrated humility, sincere remorse, and accountability. His mother describes him as having accepted guidance, sought counseling, and taken responsibility for his actions. (Exhibit A, Letter from Jeanne Hanlon) His stepfather

emphasizes that he is "not beyond redemption," and both parents have reaffirmed their unwavering commitment to supporting him. (Exhibit B, Letter from Robert Springer).  A long-time friend describes Mr. Hanlon as compassionate, emotionally intelligent, and capable of providing meaningful support to others, even during that friend's most difficult moments. (Exhibit C, Letter from Andrea Ditch).

Since his current detention, Mr. Hanlon has re-engaged in counseling at the Alexandria Detention Center. Unlike prior treatment experiences, this counseling has involved sustained examination of the underlying causes of his behavior. Mr. Hanlon reports that, for the first time, he is being challenged to confront patterns, motivations, and decision-making processes rather than merely addressing surface-level symptoms. He has responded positively to this approach and has expressed that he is beginning to see himself differently.  (Exhibit D, Letter from Nicholas Hanlon).

Mr. Hanlon was profoundly affected by reviewing victim interviews in this case. He has described feeling shattered and disgusted by his own conduct. While it is true that acceptance of responsibility did not occur immediately, a complete and thorough review of discovery led him to the only appropriate resolution: a guilty plea. By resolving the case before trial, Mr. Hanlon sought to spare the victims the additional trauma of testifying and being required to relive their experiences in open court. Furthermore, Mr. Hanlon remains committed to trying to appropriately demonstrate his remorse to the victims in this case.  To that end, he has agreed to a restitution order.  And, despite limited resources, Mr. Hanlon is working to facilitate an initial

restitution payment by the time of sentencing.[2]

The Court is, of course, constrained by a substantial mandatory minimum sentence. Nonetheless, Mr. Hanlon's background illustrates a history of mental health struggles and demonstrates that he is amenable to continued therapeutic intervention. These characteristics are relevant to the Court's assessment of his history and characteristics under § 3553(a).

### III.    More than 45 Years of Incarceration is not Necessary to Promote the Goals of Sentencing.

The defense recognizes the seriousness of the offenses and the profound harm caused. At the same time, the Court must evaluate the requested sentence in real terms. A sentence of 45 years' imprisonment is not a modest penalty; it is an extraordinarily long sentence by any objective measure. Forty-five years represents more than four decades of a person's life spent in prison.  It is time that will encompass what would otherwise be the entirety of Mr. Hanlon's middle age and much of his later life. Such a sentence ensures decades of incapacitation, promotes respect for the law, and provides ample punishment and deterrence. Even without the additional sanction the government seeks, a 45-year term is among the most severe penalties imposed in the federal system short of formal life imprisonment.

Moreover, given Mr. Hanlon's current age (40), a 45-year sentence is, in practical terms, a life sentence. If he serves the mandatory minimum term, he would not be released until he is nearly 80 years old, even assuming he received credit for good

---

[2] Mr. Hanlon is working with his mother, who holds his power of attorney and is managing his finances, to coordinate payment.

behavior. Courts have long recognized that extremely lengthy term-of-years sentences imposed on adult defendants can function as de facto life sentences, and that is precisely the situation here. By that point, Mr. Hanlon will have spent the overwhelming majority of his adult life in custody. Research consistently demonstrates that recidivism rates decline sharply with age, particularly among individuals approaching advanced age.[3] Thus, even in the unlikely event Mr. Hanlon were released at that stage of life, the risk of reoffending would be minimal. The mandatory minimum sentence therefore already accomplishes the principal goals of sentencing under 18 U.S.C. § 3553(a), including punishment, deterrence, and protection of the public, without the need to impose a formal life sentence.

## IV. Conclusion

For the foregoing reasons, Mr. Hanlon respectfully requests that this Court sentence him to no more than 45 years of incarceration.

---

[3] See Measuring Recidivism:  The Criminal History Computation of Federal Sentencing Guidelines, United States Sentencing Commission at 28 (May 2004).

Age & percent recidivating for all Criminal Histories within 24 months:

| Age | Percent |
|---|---|
| Under 21: | 35.5% |
| 21 to 25: | 31.9% |
| 26 to 30: | 23.7% |
| 31 to 35: | 23.8% |
| 36 to 40: | 19.7% |
| 41to 50: | 12.7% |
| Over 50: | 9.5% |

Respectfully Submitted,

**NICHOLAS HANLON**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia


by:_____/s/_____
Brooke S. Rupert, 79729
Cadence Mertz, 89750
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
Brooke_rupert@fd.org